```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3    PROVIDENCE HEALTH & SERVICES- )
     OREGON, an Oregon nonprofit   )
4    corporation, dba Providence   )
     Portland Medical Center,      )
5                                  )
               Plaintiff,          )  Case No. 3:17-cv-00430-MO
6                                  )
          v.                       )
7                                  )
     SANJANA PAHALAD MANCUSO,      )  July 12, 2017
8    personal representative of the)
     Estate of Rattan Kumar        )
9    Pahalad, in her official and  )
     personal capacities, and ELAP )
10   SERVICES, LLC, a Delaware     )
     limited liability company,    )
11                                 )
               Defendants.         )  Portland, Oregon
12   _____)
```

```
13

14

15

16

17                        Oral Argument

18                  TRANSCRIPT OF PROCEEDINGS

19           BEFORE THE HONORABLE MICHAEL W. MOSMAN

20          UNITED STATES DISTRICT COURT CHIEF JUDGE

21

22

23

24

25
```

```
 1

 2                           APPEARANCES

 3

 4   FOR THE PLAINTIFF:        Mr. Arden J. Olson
                               Harrang Long Gary Rudnick, PC
 5                             360 E. 10th Avenue, Suite 300
                               Portland, OR  97401-3273
 6

 7

 8   FOR THE DEFENDANTS:       Mr. Kristopher R. Alderman
                               Fisher Broyles
 9                             945 East Paces Road, Suite 2000
                               Atlanta, GA 30326
10

11                            Ms. Mary-Anne S. Rayburn
                               Gordon & Polscer, LLC
12                             9755 S.W. Barnes Road, Suite 650
                               Portland, OR 97225
13

14

15   COURT REPORTER:          Bonita J. Shumway, CSR, RMR, CRR
                               United States District Courthouse
16                             1000 S.W. Third Ave., Room 301
                               Portland, OR  97204
17                             (503) 326-8188

18

19

20

21

22

23

24

25
```

```
 1                    (P R O C E E D I N G S)

 2            THE CLERK:  Your Honor, this is the time and place

 3    set for oral argument in Case No. 3:17-cv-430-MO, Providence

 4    Health & Services-Oregon v. Mancuso, et al.

 5            Counsel, can you introduce yourself for the record.

 6            MR. OLSON:  Arden J. Olson for the plaintiff,

 7    Providence.

 8            MR. ALDERMAN:  Your Honor, Kris Alderman and

 9    Mary-Anne Rayburn for the defendants.

10            MS. RAYBURN:  Good afternoon, Your Honor.  Mary-Anne

11    Rayburn.

12            THE COURT:  Thank you all for being here.  I want to

13    lay out my tentative thoughts and then I'll hear your

14    responses.

15            First, I think it's important in this case to

16    decide -- or to keep in mind the difference between complete

17    preemption and conflict preemption, since the former provides a

18    vehicle for federal question jurisdiction, and impacts,

19    therefore, the question of removal and remand, and the latter

20    provides only a defense but does not create federal question

21    jurisdiction.  And the cases don't always make clear

22    distinctions between those two concepts, so I think we have to

23    try to do so here.

24            The parties have argued the case both as to the

25    specific elements of *Barr v. Ross Island*, and I would say also
```

1    on a broader level, just somewhat descriptively, that is, the

2    parties have talked about whether this claim really is an ERISA

3    claim in disguise, in the guise of a UTPA claim and, you know,

4    whether it's what really is going on here.

5          The way I think about it is that's a useful concept

6    to keep in mind, is this an ERISA claim in disguise, but the

7    two-part test of *Barr v. Ross Island* is designed to capture

8    exactly that, that any time there is an ERISA claim in disguise

9    as a state statutory or even common law claim, the test will

10    pick that up.

11          So what I need to do, I think, and also because the

12    Ninth Circuit has so counseled, is to keep in mind this

13    two-part test.

14          So the first of the two-part -- the first prong is

15    whether the plaintiff here at some point in time could have

16    brought the relevant claim -- the third claim here -- under

17    ERISA.  And that's claim-focused, and it's also, I think,

18    plaintiff-focused; that is, it's could plaintiff have brought

19    this claim under ERISA, not could plaintiff have brought a

20    claim under ERISA.

21          I think it's likely here, just by way of digression,

22    that by virtue of the assignment, if for no other reason, there

23    is an ERISA claim that this plaintiff could have brought.

24    That's really not the question *Barr v. Ross Island Sand &*

25    *Gravel* asks, it's could this claim have been brought as an

1  ERISA claim.

2          And so there, I think, thus circumscribed, my

3  tentative view is that the answer to that question is no, that

4  the claim being brought here is not one that could have been

5  brought as an ERISA claim.

6          The primary contrary argument that ELAP makes here

7  centers on the remedy, and there are -- I am concerned, in

8  terms of conflict preemption, about the injunctive relief

9  sought here.  Some portions of the injunctive relief I think

10 clearly invoke ERISA, but the analysis as to whether this claim

11 could have been brought under ERISA is claim, not remedy

12 focused.  It's really not possible to apply the two-part test

13 of *Barr v. Ross Island* to remedies.

14         Now, we can talk later about the true nature of those

15 remedies, but in any event, my own tentative view is that this

16 claim couldn't have been brought as an ERISA claim.

17         So that's enough.  You have to get past both hurdles

18 of *Barr* to get to complete preemption, and the answer no to the

19 first prong is probably enough, but I'll move to the second

20 prong just because they're useful to think about together.

21         The second one is does the claim that is being

22 brought invoke an independent legal duty under the UTPA --

23 "independent" meaning a duty not bound in ERISA.  And again

24 here, I think the answer to that question is tentatively yes.

25         It's true as far as it goes that *Metropolitan Life*

1   suggests that there are obligations found in general common law

2   claims or I would say state statutory claims, claims of general

3   application that can interfere with ERISA rights and duties,

4   but that's not the question *Barr* is asking, and the *MetLife*

5   case cited by ELAP here is actually a conflict preemption case.

6   So once again, we're at that point of bifurcation, where I'm

7   trying to focus on the existence vel non of complete

8   preemption.

9           So I believe the answer to both of those questions

10  being no means that there's no complete preemption.  As I've

11  said, I'm not sure the assignment plays a big role, because

12  even if it's true that the assignment could have allowed for an

13  ERISA claim to be brought, the plaintiff is free to elect not

14  to bring an ERISA claim and seek some other remedy.

15          Probably the occasion where one most sees this case

16  as pled, bringing up ERISA, is in the injunctions A, B, and D,

17  which directly implicate ERISA.  As I've said, I don't think

18  that's where I look to find complete preemption.  I think it's

19  where I will eventually have to look some day, or rather some

20  court will have to look to find conflict preemption.

21          So I'd like to go that far with my tentative

22  analysis.  I'll let the defendants respond first, since the

23  ball is sort of in their court, and then if we get that far,

24  then we'll talk about their request for attorney fees.

25          Go ahead.

```
1              MR. ALDERMAN:  Thank you, Your Honor.  I appreciate
2    you outlining your tentative thoughts.  I've argued a lot of
3    these motions and have not gotten those tentative thoughts in
4    advance.  It's helpful to have those and now try to make my
5    case a little stronger.
6              THE COURT:  I'm just here to make your life easier in
7    any way I can.
8              MR. ALDERMAN:  I appreciate that, Your Honor.
9              The reason I think it's important to look at the
10   remedy they're asking for is because although they have
11   enumerated only three claims or three causes of action in their
12   complaint, the third cause of action, which is the one directed
13   at ELAP, really asks for a lot of different types of relief.
14   In my mind, they're really a lot of different claims, a lot of
15   different causes of action.
16             I think that --
17             THE COURT:  Why do you say that?  Because a claim, a
18   single claim, something that everybody agrees is a single claim
19   can seek various remedies without branching out into becoming
20   more than one claim, right?
21             MR. ALDERMAN:  I'd agree with that premise, Your
22   Honor.
23             THE COURT:  Why is this case different?
24             MR. ALDERMAN:  In this particular instance, the
25   reason I think that's different is there is -- the UTPA claim
```

1    is premised, in my mind, on alleged misrepresentations that

2    ELAP made to various parties, and from that, they're asking for

3    relief in the way of damages that they can show have been

4    suffered by the hospital as a result of those

5    misrepresentations.

6              But they also ask for different types of relief that

7    don't stem from those misrepresentations.  So those -- that --

8    those categories of relief can't be tied to that UTPA claim

9    because the constructive trust claim -- I'll call it a claim --

10             THE COURT:  Let me stop you there.  That's an

11   interesting argument and I'd like to ask you this.  Let's

12   assume you're right that there's a UTPA claim that for purposes

13   of my hypothetical only you'll acknowledge is a straight-up

14   state claim not an ERISA claim in disguise, and it seeks the

15   sort of classic UTPA relief, but on top of that it seeks

16   ERISA-based relief, you know, a declaration, for example, that

17   the plan underpaid its beneficiary, the decedent, something

18   like that.

19             Why would that be the case then, not that there's two

20   claims now in the case, an ERISA claim and a UTPA claim, but

21   just that there's a form of relief that the UTPA claim doesn't

22   warrant and you'd strike the relief from the case?  In other

23   words, why does seeking non-UTPA remedies amount to an ERISA

24   claim as opposed to too many remedies under the UTPA?

25             MR. ALDERMAN:  So I think the answer to that question

1   is that the -- if the relief is stricken, as you suggest, then

2   essentially, in my view, the claim is stricken, which would be

3   an acceptable result, because what they're asking for is

4   essentially an ERISA claim for benefits.  But a constructive

5   trust claim says enter an order holding in constructive

6   trust all monies that should have been paid under the plan, according

7   to the terms of the plan.  And that's just a classic ERISA

8   claim for benefits.

9        If that's struck -- and I don't know the procedural

10  mechanism for doing that, because we're talking all

11  hypothetical now, but if that's struck, then essentially what

12  we're asking for has been granted --

13       THE COURT:  Well, I'm asking a slightly different

14  question, although that's a useful answer.  But let's say

15  someone brings a breach of contract claim and says, I want my

16  contract damages, you know, the ones actually bargained for in

17  the contract, and I also want consequential damages and I want

18  emotional distress damages.

19       And you say, well, you can get one and two, but you

20  just can't get three for breach of contract.  Your argument

21  would not be -- it seems to me you've asked for damages you

22  just can't get.  Your argument would be, oh, they're seeking a

23  claim for intentional infliction of emotional distress, but why

24  would you use a remedy not available under the claim that's in

25  the complaint as a reason for saying, well, the complaint is

1    actually making a second whole new claim instead of just

2    saying, well, they just asked for a remedy they're not entitled

3    to get?

4              MR. ALDERMAN:  Sure, I understand -- I understand

5    your question.  I think if this was not a situation where, in

6    my mind, ERISA complete preemption is implicated, what we would

7    have done in state court is simply filed a motion to dismiss

8    those requests for relief, saying they're not available, which

9    that is what you do in the breach of contract cases.

10             THE COURT:  Right.

11             MR. ALDERMAN:  The reason this is different is

12   because they've sought relief, essentially made a claim that

13   can only be brought under ERISA, because of ERISA --

14             THE COURT:  Well, I mean, words matter.  They haven't

15   made a claim that can only be sought under ERISA.  They've

16   asked for relief that possibly conflicts with ERISA, right?

17             MR. ALDERMAN:  I understand the premise of that

18   question, but I don't agree with it.

19             THE COURT:  I take that because they, for example,

20   sought relief that enjoins you, your client, directly or

21   through its administrator, from representing to anyone really

22   that Providence's charges exceed the plan's allowable limits,

23   you think because they asked for that that they're making an

24   ERISA claim?  That's effectively making an ERISA claim?

25             MR. ALDERMAN:  I think they have made a couple of

1    claims that are ERISA claims, and that is one of them.  I think
2    the easiest one to look at is the paragraph 5 of their prayer
3    for relief, the constructive trust.  That is a claim for ERISA
4    benefits.  They're asking for an order holding in constructive
5    trust, which is the same as an order ordering ELAP to pay the
6    benefits that should have been paid under the terms of the
7    plan.
8        THE COURT:  Well, let's talk about the constructive
9    trust, then.  Why doesn't that play out like this:  That
10   Providence says, we take no position on what should or
11   shouldn't be paid out to the estate here, just whatever gets
12   paid out ever to the estate, since the estate owes it to
13   Providence, we want the Court to order ELAP to pay it or hold
14   it, at least, for Providence.  That's just what a constructive
15   trust is, right?  It doesn't seek to litigate the underlying
16   dispute now between the estate and ELAP, it just says whatever
17   comes out of that dispute, we don't care what the plan says, it
18   might be zero, we take no position on whether it's zero or
19   $100,000, but whatever comes out of it, since the decedent owed
20   it to us, let's not let it disappear to the decedent.
21       Isn't that what the constructive claim is about?
22       MR. ALDERMAN:  I believe the constructive trust claim
23   is making an affirmative claim that some amount of money is
24   owed.
25       THE COURT:  How much and why?

1    MR. ALDERMAN:  I don't know how much because there's

2  been no demand.  Actually, there's been no demand as to any of

3  the claim as to how much.  There's been no indication on what

4  damages were suffered on any parts of the claims.

5    THE COURT:  Well, so you don't know from the

6  constructive trust whether your opponent takes any position

7  based on any particular reading of the plan that any particular

8  amount is owed, right?

9    MR. ALDERMAN:  That's correct.

10    THE COURT:  I understand your argument, and it's not

11  a frivolous one, that because of the nature of the relief being

12  sought, you think that amounts to a claim.  How do I apply *Barr*

13  *v. Ross Island* as to that claim?  You say that the relief kind

14  of -- sort of calls into existence an ERISA claim.  So how does

15  that play out under *Barr*?

16    MR. ALDERMAN:  Sure, Your Honor.  I think -- let me

17  start by saying -- and I may have touched on this earlier, but

18  there is no allegation of a misrepresentation or statement made

19  by ELAP that would have any relationship to whether any more

20  money is owed under the terms of the plan, making this to me

21  again a wholly separate claim, because no matter what ELAP may

22  have said about anything alleged in the complaint, it would not

23  change the amount in the plan that should have been paid.  It

24  wouldn't change the terms of the plan.  So I see these as two

25  just completely separate things.

1    THE COURT:  Well, it might change the amount the

2    estate pays Providence, right?  The UTPA theory is quit telling

3    the estate that they don't owe us money; they do.  Isn't that

4    the UTPA theory?

5    MR. ALDERMAN:  Yes, Your Honor.  And I think there is

6    a way to plead that claim, and there are valid state law claims

7    that are not completely preempted by ERISA in the complaint.

8    And we've identified, in our opposition papers, we've

9    identified three parts of the claim that we think are claims

10   for ERISA benefits or are claims that could have been brought

11   under ERISA and don't implicate any other duties other than

12   ERISA.

13   THE COURT:  Well, let me ask you this.  If the relief

14   sought under the UTPA had been more circumscribed, seeking

15   only, for example, an injunction against communicating with the

16   estate about how much they should pay Providence, would that be

17   a straight-up UTPA claim with no complete preemption?

18   MR. ALDERMAN:  Without seeing it, Your Honor, yes, I

19   believe it would.

20   THE COURT:  I guess what I'm getting at is you are

21   basing your idea that the UTPA claim is subject to preemption

22   based on the remedies it seeks, not on the actual nature of the

23   claim itself, right, separate from the remedies it seeks?

24   MR. ALDERMAN:  I don't think it's separate because

25   there are too many parts of their claim, because the remedy

1    they're seeking, the plan benefits, is not tied at all to the

2    allegations they make.  They're asking for plan benefits and

3    they're talking about misrepresentations, which are two

4    separate things.  So they have to be saying -- at least I

5    understand they have to be saying that the plan underpaid what

6    it should have paid, therefore they want a constructive trust

7    around that money so that they can get paid that amount of

8    money.

9            THE COURT:  Well, I guess why can't it be that the

10   decedent underpaid the -- the estate underpaid what it should

11   have paid, so if anybody on earth is going to give the estate

12   money, let's make sure the Court is aware that that's happening

13   so that the money goes from the estate to Providence.

14           Why does it have to be anything to do with the plan?

15   Why can't they just say that the entity that has underpaid here

16   is the estate to Providence?

17           MR. ALDERMAN:  They could, and I think they did in

18   state court initially.  They initially filed an original

19   complaint that had two claims against the estate and the

20   administrator of the estate, and now they've repled that with

21   an amended complaint that has claims against ELAP, and is

22   asking ELAP to essentially pay through a constructive trust the

23   amount of benefits that should have been paid under the terms

24   of the plan.

25           THE COURT:  All right.  Thank you very much.

1      MR. ALDERMAN:  Thank you, Your Honor.

2      THE COURT:  Your response?

3      MR. OLSON:  Yes, Your Honor.  Obviously, I agree with

4  much of what you said in your preliminary comments.  Several

5  things I wanted to just emphasize.  They confused jurisdiction

6  and standing in their brief.  I don't know if Your Honor wants

7  to hear anything about that, but when we're talking complete

8  presumption as opposed to some other kind of a case, this is a

9  jurisdictional problem, and they're attempting to make it go

10  away by saying this is just a standing issue.

11      And then to argue in their brief that election

12  doesn't even matter whether the assignment was effective and

13  this claim could have been brought under the first prong of the

14  test is simply a nonstarter.  I think Your Honor is exactly

15  right that this claim needed to be brought under ERISA in order

16  for the first prong of the complete preemption to apply.

17      And if you look at Section 1132 and the *DB Healthcare*

18  case that we cited, Your Honor, it clearly establishes that

19  Providence is not a beneficiary such that under 1132(a)(1)(B),

20  Providence could not have brought a claim against the plan here

21  unless it was a claim by assignment.  And we went through in

22  the brief of why the assignment didn't accomplish that here.

23      THE COURT:  So you're not bringing any claim by

24  assignment, right?

25      MR. OLSON:  We're not bringing any claim by

1    assignment.

2            THE COURT:  Is your constructive trust asserting that

3    the plan owes the estate more money?

4            MR. OLSON:  We don't know, Your Honor.

5            THE COURT:  You don't know if your claim is asserting

6    that?

7            MR. OLSON:  We don't know whether the plan owes the

8    estate more money.  What we want -- what that constructive

9    trust claim is about is whatever is owed ought to be paid the

10   plan, and in the first instance --

11           THE COURT:  Which might be zero?

12           MR. OLSON:  Might be zero.

13           THE COURT:  As far as you know?

14           MR. OLSON:  We don't know.

15           In the first instance, that's a problem between the

16   estate and the plan and its plan administrator, ELAP.  They've

17   denied the claim.  The estate still has time within the

18   statute, the three years that they give them to file a federal

19   lawsuit.  Whether they do that will remain to be seen, but in

20   the first instance, they're the ones that have to work out

21   what's owed or what's not owed.  We're not party to that plan

22   and we haven't brought a claim against that plan, and in fact

23   our claim against ELAP isn't against the plan at all, it's

24   against ELAP for their statements to the estate and our

25   patient, essentially our -- the successor to our patient, the

1   estate of the patient over disparaging our pricing structure.

2   And that isn't about anything related to the level of benefits

3   in the plan.  It has to do with disparaging our pricing.

4           THE COURT:  How is the remedy of a constructive trust

5   related to disparaging your pricing structure?

6           MR. OLSON:  I believe that because of their, I think,

7   wrongful, inequitable conduct, that if there is money owing, a

8   state court exercising equity jurisdiction could decide that if

9   they hold monies that are owed to the estate, they should hold

10  them for us, because we are entitled to whatever is available

11  here.

12          THE COURT:  So it's, in your view, a substitute for

13  damages normally sought?  You could just say, you've disparaged

14  our pricing structure, we've been harmed by that, and so you

15  owe us $100,000?

16          MR. OLSON:  Under the UTPA, there is a concept called

17  ascertainable loss, which is the closest thing that's analogous

18  to damages, but that's a fairly focused remedy, and it isn't

19  really a damages remedy, it's a statutory remedy.  It's not

20  like a contract damages remedy.  The UTPA does give this

21  equitable power to the court sitting in equity to impose other

22  remedies.

23          THE COURT:  What are your losses under the UTPA?

24          MR. OLSON:  Well, certainly some of the costs of what

25  we've had to go through to collect, is what we've pled, and

1    what I believe are recoverable under the UTPA, and whether

2    there's more than that -- whether, for example, we have the

3    right to claim something else that flowed from that

4    misrepresentation is a series of circumstances that we need to

5    explore in discovery and pleading in the state court, but none

6    of that is an ERISA remedy.

7              Now, in order to have the ERISA remedy, you have to

8    have someone who has the capability under the first part of the

9    test of bringing an ERISA claim, and that's not us; and the

10   second has to be no independent duty.  Well, the independent

11   duty is the one set out by the UTPA that applies regardless of

12   whether it's an ERISA plan, and is actually not being asserted

13   against the plan, it's being asserted against ELAP.

14             THE COURT:  So your contention on the duty is that it

15   doesn't require any embodied understanding or contractual

16   relationship or anything like that for that freestanding UTPA

17   duty to exist, right?

18             MR. OLSON:  It's a statutory duty.  It's a statutory

19   duty not to disparage our goods and services.

20             THE COURT:  And then if I have your argument right,

21   there are really two contingencies built into getting any money

22   out of your sought relief of a constructive trust.  First --

23   first, I guess, is that there are UTPA damages beyond the

24   damages involved in seeking collection; and second, that there

25   is some sort of money owed by the plan itself through its

1   administrator to the estate?

2          MR. OLSON:  For there to be constructive --

3          THE COURT:  If the answer to either is zero, then

4   there's no constructive trust but no money paid?

5          MR. OLSON:  It's a very separate question when we get

6   back into the merits of this case whether or not we will be

7   able to demonstrate the damages that we would like to assert.

8   And when I say "damages," what I mean is equitable relief.  In

9   the state court, that doesn't go to whether or not this was an

10  ERISA claim, it just goes to whether we can prove our claim in

11  state court.

12         THE COURT:  So you acknowledge, I suppose, that

13  injunctions A, B, and D do seem to -- I'll just say invoke

14  ERISA, right?

15         MR. OLSON:  Actually, I don't agree that they invoke

16  ERISA.

17         THE COURT:  It's not really a question for today.  I

18  guess I'm just trying to nail down your position.  There is, at

19  least, an issue of conflict preemption raised by these three

20  paragraphs, right?

21         MR. OLSON:  There might be.  I don't agree that there

22  is, but, for example, A, we're asking for an injunction that

23  they stop representing to our patients that appeal rights under

24  the patient's plan apply also to the providers of the services.

25  We think that's a misrepresentation of the law as applied to

1    our patients, and it's contrary to the *DB Healthcare* case,

2    where --

3              THE COURT:   What about B?

4              MR. OLSON:   And representing to PH&S-O or its

5    patients that provider charges exceed the plan's allowable

6    claim limits.

7              THE COURT:   Do you have to interpret the plan to get

8    that far?

9              MR. OLSON:   We might have a conflict preemption issue

10   there.

11             THE COURT:   So your answer for today's purposes is

12   that's at worst for you conflict preemption, not complete

13   preemption?

14             MR. OLSON:   Correct.

15             THE COURT:   And this idea that seeking an ERISA

16   conflicting remedy sort of operates backwards to create an

17   ERISA claim, what do you make of that?

18             MR. OLSON:   That's -- the first prong of the

19   standards is that liability must be asserted.   The claim must

20   seek liability that is only available under ERISA.   It isn't

21   about damages.   And they're trying to turn the damages thing

22   into a claim, as Your Honor was appropriately pointing out.   I

23   don't think that satisfies the first prong of the test.

24             THE COURT:   The test being the *Barr v. Ross Island*

25   test?

1          MR. OLSON:  Yeah.  I think of it as the *Aetna v.*
2  *Davila* test.
3          THE COURT:  Also?
4          MR. OLSON:  Also.  So that's the test we're here on.
5          THE COURT:  All right.  Thank you very much.
6          MR. OLSON:  Thank you.
7          THE COURT:  I'll give you the final word, sir.
8          MR. ALDERMAN:  Thank you, Your Honor.
9          I don't have a lot to add.  I just want to kind of
10 get back to this idea of what is a claim and what is relief.  I
11 think it's possible to have a situation like you described
12 earlier, where there's one set of facts that leads to several
13 types of relief, and maybe in your contract claim example
14 somebody feels like because they breached the contract, I had
15 all of this emotional harm, and they tie that emotional harm
16 back to the breach of contract.  For legal reasons, that
17 doesn't work, we know that, but they are tying the relief
18 they're asking for to the harm that they're alleging.
19          In this case, there is absolutely no way to tie the
20 relief that they're asking for on the constructive trust --
21 that is, additional plan benefits being paid -- to the harm
22 they're alleging, because as I said earlier, there's no way,
23 even if they proved every allegation they have in this
24 complaint about a misrepresentation, there's no way that
25 they -- the result of that is more money should be paid under

1   the terms of the plan.  That's why I see these as separate and

2   distinct claims, because there's no way to tie the constructive

3   trust claim back to the misrepresentations that are the basis

4   of their UTPA claim.

5        THE COURT:  You're saying that they're limited to

6   certain damages under the UTPA -- well, "damages" as a

7   colloquial term under the UTPA, such as increased collection

8   efforts, and that's it, or you don't know what they're able to

9   get?

10        MR. ALDERMAN:  No, that's not exactly my position.

11   Instead what I'm saying is if they -- you might look at this as

12   one claim, several categories of relief, if you could tie each

13   category of relief to the harm that they allege.  So if there's

14   a way to tie their request for a constructive trust to a

15   misrepresentation --

16        THE COURT:  Right.  So your idea is that the

17   constructive trust is untethered, unconnected to any UTPA-based

18   liability?

19        MR. ALDERMAN:  Yes, Your Honor.  That's why I view it

20   as a separate claim.  It's as if they're just sliding it under

21   the rug, bringing it along but trying to call it a UTPA claim

22   when, in fact, really it's just a claim for benefits.

23        THE COURT:  So the argument you're facing is -- from

24   your opponent I think goes something like this:  That we think

25   we're going to be entitled to some money by way of a form of

1    damages under the UTPA.  We don't know how much yet.

2           And so if that turns out to be true, then your client

3    owes Providence money.  Then to the degree that there is still

4    money headed from the plan or its administrator -- through its

5    administrator to the estate, the equitable relief sought is to

6    impose a sort of a -- almost a holding pattern on that money

7    until we know how the damages -- the money can be paid by way

8    of damages straight to plaintiff.

9           So I guess the substitute would be a straight claim

10   for UTPA, with a sort of a standard claim for damages wouldn't

11   invoke an equitable trust but might result down the line in an

12   equitable trust anyway someday just in equity, right?  I mean,

13   it's the -- you could, by seeking UTPA damages, eventually a

14   court could end up imposing an equitable trust on money that's

15   floating out there, just to make sure the damages get paid,

16   right?

17          I guess I'll phrase it slightly differently.  Your

18   contention is that because they seek an equitable trust of

19   money that would normally flow between the plan and the estate,

20   that since that's an ERISA-based relationship, this must be an

21   ERISA claim.  And what if instead the UTPA claim just sought

22   typical UTPA relief by way of money and left it silent?  Where

23   would you be?

24          MR. ALDERMAN:  Well, actually, I think there's an

25   exhibit to Mr. Olson's declaration.  It's the first letter I

1    sent to Mr. Olson before we filed the notice of removal, where

2    I specifically said if you'll remove that claim and maybe a

3    couple of other allegations, we wouldn't remove it, because

4    that is the problem is this claim for benefits here.  I think

5    that's what you're asking.  If they're not making a claim for

6    benefits disguised as constructive trust, along then with the

7    UTPA claim, we wouldn't even be here in this court because we

8    wouldn't have filed a removal.

9          THE COURT:  You'd be litigating whether you violated

10   UTPA and whether you owed any money for it?

11         MR. ALDERMAN:  Yes, Your Honor.

12         THE COURT:  And you'd say we didn't violate, but even

13   if we did, we don't owe you as much as you claim, or we don't

14   owe you anything, right?

15         MR. ALDERMAN:  We would certainly raise all those

16   defenses.

17         THE COURT:  So my question is if that is where you

18   would have been, then I'm not clear.  I think maybe the answer

19   is that you and your opponent view what's happening with the

20   equitable trust dramatically differently.  If it's true that

21   the equitable trust doesn't claim any particular amount and

22   doesn't advocate for any particular outcome in the debate

23   between the plan and the estate, but only says, well, however

24   this plays out, hang on to the money, because if at the end of

25   the day ELAP owes Providence money, we want some of that money.

1          So you don't view that as an accurate description of

2     the claim for equitable trust, right?

3          MR. ALDERMAN:  I don't.  I know that --

4          THE COURT:  You take the position that they're

5     actually taking a position in some maybe vague way about what

6     ought to happen in that debate about whether the plan owes the

7     estate more money, right?

8          MR. ALDERMAN:  Yes, Your Honor.  And I'm basing that

9     not on the motion that was filed or the reply that was filed,

10    where -- I think I pointed out in the opposition papers, they

11    recharacterized this constructive trust in their motion

12    originally, and then they recharacterize it again in the reply.

13          But just looking at the language here, it asks the

14    Court to enter an order in equity requiring ELAP hold all

15    amounts which the plan owes or would have owed to Pahalad's

16    estate under the plan and constructive trust.  And skipping

17    down, it talks about, under the terms of the plan, not -- it's

18    not talking about some hypothetical case that may happen in the

19    future or may not, it's talking about --

20          THE COURT:  You read it as advocating that the plan

21    does, in fact, presently owe the estate money?

22          MR. ALDERMAN:  Yes, Your Honor.

23          THE COURT:  And the theory for why to be developed

24    later?

25          MR. ALDERMAN:  I can only imagine that they are

familiar enough with the principles of ERISA and how plans work

that they think the terms of the plan require payment of more

money.

THE COURT:  So today in court, counsel for Providence

says that's not what this claim seeks to do.  Counsel for

Providence acknowledges that, in fact, it takes no position --

according to Providence today in court, it takes no position on

how the plan ought to be interpreted in the debate between ELAP

and the estate and, in fact, takes no position as to whether

any money is, in fact, owed.  It claims to be agnostic about

that.  It might be zero, it might be a lot.

If I take counsel at his word there, as in that that

is now binding on Providence, then why isn't that the way in

which I should today read the claim?

MR. ALDERMAN:  Well, I think for one reason --

THE COURT:  I guess to put it another way, why

haven't you essentially won that battle through oral argument

today by a concession that money owed doesn't mean that any

money is, in fact, owed; it's completely agnostic about the

outcome?

MR. ALDERMAN:  I think to some extent we have won

that battle based on that concession if they're not

claiming they're entitled to any benefits under the plan, but

they're claiming only that they're asking for the Court --

THE COURT:  Not to put it too finely, but it's not so

1    much that they're saying not entitled to any benefits under the

2    plan.  They're saying whatever may happen, we take no position

3    on that.  We are going to make no arguments about what ought to

4    happen, but if it turns out that money is owed by the plan to

5    the estate, since the estate owes us money, we want some of

6    that money if it ever happens.

7              That's the interpretation today.  So why isn't that,

8    since that's now binding on Providence, your concern -- in

9    fact, part of why you filed your motion was the idea that you

10   now faced another adversary in fighting about what the plan

11   does or doesn't owe the estate.

12             If that turns out not to be the case, you in fact

13   face a -- sort of a disinterested bystander who just waits to

14   see if any money is owed, then, one, shouldn't I interpret the

15   claim that way, and then, two, if I do, having really sort of

16   achieved at least a partial victory there, but also a defeat to

17   your motion?

18             MR. ALDERMAN:  I think the --

19             THE COURT:  Let's start with the first question.

20   It's easier.  Shouldn't I interpret the claim in light of

21   counsel's binding expressions about what the claim does or

22   doesn't do?

23             MR. ALDERMAN:  I don't have the case prepared to cite

24   to you because this wasn't something we briefed, but I believe

25   the law is that when you are evaluating this claim for purposes

1   of whether you have jurisdiction, you're confined to the

2   pleadings, and the pleadings say they want a constructive trust

3   around what the plan owes or would have owed.  And that's

4   different than what Mr. Olson said today.  I acknowledge that

5   he's changed it.

6        THE COURT:  Well, I think instead I would say it's

7   susceptible possibly to more than one meaning, and he has

8   defined which meaning it has in a binding way.  You're

9   suggesting that despite him saying that, you run some risk that

10  it could be interpreted otherwise, and therefore are entitled

11  to the possibility that that might happen.

12        I see zero risk right now that any court could in

13  this particular case interpret the complaint any other way than

14  what he has described today.

15        MR. ALDERMAN:  I agree with that.  They could not

16  come back after today and take a position that they're claiming

17  entitlement to any benefits.

18        You spoke a minute ago and said not to slice it too

19  finely, maybe they're not saying they're not entitled to any

20  benefits.  I think they are saying they're not entitled to any

21  benefits.  I think they would be interested in a constructive

22  trust based on the arguments today on some specific fund of

23  money that may exist in the future but not plan benefits,

24  because if they're entitled to plan benefits, then this is a

25  claim for benefits under ERISA.  So I think it is accurate,

1    based on the way we're now recharacterizing paragraph 5 of the

2    prayer for relief that they're not claiming any entitlement to

3    plan benefits whatsoever.

4         THE COURT:  You mean somehow plan benefits paid

5    directly to them as benefits?  What they're asking for is --

6    when I say they're agnostic, the position your opponent has

7    staked out is they don't know if your client owes the estate

8    any money or ever will.  That is being litigated before me and

9    may be done being litigated, we don't know.  That's the

10   position on which they're agnostic.  They don't know how it's

11   going to pan out, the fight between your client and the estate.

12   But if that fight turns out to award the estate some money,

13   Providence wants that money because the estate owes it to

14   Providence.  That's their argument.

15        So that's the way in which the claim which you said

16   was based on the plan, staking out a position that the plan

17   does, in fact, today owe the estate more money has been

18   circumscribed.

19        Anyway, I appreciate your arguments.

20        MR. ALDERMAN:  Thank you, Your Honor.

21        THE COURT:  So I do want to clarify.  Counsel, you've

22   corrected me on this, and you're right.  I talked about *Barr v.*

23   *Ross Island*, which does have two parts to it, complete and

24   conflict preemption, but the two-part test we've been talking

25   is *Aetna Health v. Davila*.  So I don't want to confuse anybody

1    there.  You all sounded like you knew what I was saying, even

2    though I was saying it wrong.  So I appreciate you doing that.

3    But the test I'm talking about is not the two parts of *Barr* but

4    the two parts of *Aetna*.

5            And so focusing on that two-part test, I do think

6    that the important thing is to look at the claims themselves,

7    and so therefore to formally hold what I held earlier, I don't

8    think the claim here is a claim that could have been brought

9    under ERISA.  The arguments are subtle ones, and I'm not

10   suggesting it can never be the case that seeking a particular

11   sort of remedy doesn't really reveal the true nature of your

12   claim, but here I think the true nature of the claim is fairly

13   grounded in the UTPA and not ERISA.

14           And I do that, candidly, in part based on counsel for

15   Providence's description of what the claim is really seeking,

16   because I think we'd be even closer and maybe even over the

17   line on complete preemption if, in fact, the equitable trust

18   language in the complaint was read to assert that the plan owes

19   the estate money, that there is a theory by which the plan owes

20   the estate money and has wrongfully failed to pay that money

21   under the plan.  That would be an ERISA claim.

22           But having disavowed that in what I view as a binding

23   way, I don't think it's currently a fair reading of the claim,

24   nor really in my view was it the most likely reading of the

25   claim originally.

So with that in mind, I don't think this claim is one that is an ERISA claim in disguise or could have been brought under ERISA.  I think it implicates in particular ways independent legal duties under the UTPA not found in ERISA, and that's sort of without the need, I think, to find any kind of contractual or other relationship between ELAP and Providence. I think that's a sort of a freestanding, almost societal commercial duty codified in the UTPA.

The second part of the claims that do raise concerns about ERISA are the paragraphs I've mentioned seeking injunctive relief.  That does seem to require at least the possibility of interpreting the plan to grant or deny the requested injunctive relief.  But I think it's accurate to say that that's a question for a later date of conflict preemption not complete presumption.  So we'll just have to see how that plays out at a later date.

I therefore think that Providence has the better of this argument as to whether this is really grounded in ERISA. I say "better of the argument," however, without finding a sufficient basis to award attorney fees.  The argument I think is a close one, with a reasonable foundation for making it.  In fact, it turns out, I think, that for my analysis, the clarification provided by counsel at oral argument becomes a relatively important piece of the puzzle and couldn't have been known in advance in a way that would trigger attorney's fees

1  because the argument against -- because removal was not

2  objectively reasonable.  Therefore, I deny the request for the

3  sanction of attorney fees.

4          Anything further from Providence today?

5          MR. OLSON:  Nothing, Your Honor.

6          THE COURT:  From defendants?

7          MR. ALDERMAN:  No, Your Honor.

8          THE COURT:  Thank you.  We'll be adjourned.

9          THE CLERK:  This court is adjourned.

10          (Proceedings concluded.)

1

2                                    --o0o--

3

4           I certify, by signing below, that the foregoing is a

5    correct transcript of the record of proceedings in the

6    above-entitled cause.  A transcript without an original

7    signature or conformed signature is not certified.

8

9

     /s/Bonita J. Shumway              July 19, 2017

10   _____         _____
     BONITA J. SHUMWAY, CSR, RMR, CRR       DATE
11   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25